Matter of Kurtzrock (2020 NY Slip Op 08114)





Matter of Kurtzrock


2020 NY Slip Op 08114


Decided on December 30, 2020


Appellate Division, Second Department


Per Curiam.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on December 30, 2020
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

ALAN D. SCHEINKMAN, P.J.
WILLIAM F. MASTRO
REINALDO E. RIVERA
MARK C. DILLON
RUTH C. BALKIN, JJ.


2019-06381

[*1]In the Matter of Glenn Kurtzrock, admitted as Glenn Ross Kurtzrock, an attorney and counselor-at-law. Grievance Committee for the Tenth Judicial District, petitioner; Glenn Kurtzrock, respondent. (Attorney Registration No. 2953354)



DISCIPLINARY PROCEEDING instituted by the Grievance Committee for the Tenth Judicial District. The Grievance Committee commenced a disciplinary proceeding pursuant to 22 NYCRR 1240.8 against the respondent by the serving and filing of a notice of petition dated May 30, 2019, and a verified petition dated May 2019. The respondent served and filed a verified answer dated June 18, 2019. Subsequently, the Grievance Committee served and filed a statement of disputed and undisputed facts dated July 8, 2019, and the respondent filed a response thereto dated July 11, 2019. By decision and order on application of this Court dated August 15, 2019, the matter was referred to John J. Halloran, Jr., as Special Referee, to hear and report. The respondent was admitted to the Bar at a term of the Appellate Division of the Supreme Court in the Second Judicial Department on April 14, 1999.



Catherine A. Sheridan, Hauppauge, NY, for petitioner.
Long Tuminello, LLP, Bay Shore, NY (David Besso and Michelle Aulivola), for respondent.



PER CURIAM.


OPINION & ORDER
The Grievance Committee for the Tenth Judicial District (hereinafter the petitioner) served the respondent with a verified petition containing three charges of professional misconduct. Following a preliminary conference held on September 12, 2019, and a hearing conducted on November 1, 4, and 6, 2019, the Special Referee filed a report dated February 4, 2020, in which he sustained all three charges. The petitioner now moves to confirm the Special Referee's report and to impose such discipline upon the respondent as the Court deems just and proper. The respondent, by counsel, has not controverted the findings of the Special Referee. He states that he has "taken full responsibility for his failure to properly perform the duty imposed upon him as a prosecutor." However, in view of significant mitigating circumstances presented, the respondent requests that the Court impose discipline in the form of a public censure as an appropriate sanction.
The Petition
The respondent was a Suffolk County Assistant District Attorney (hereinafter ADA) in the homicide bureau under former District Attorney Thomas J. Spota (hereinafter the Suffolk [*2]DA's office). The respondent was assigned to prosecute a criminal action, People v Messiah Booker (Suffolk County Indictment No. 2325A-2015). In October 2015, a Suffolk County grand jury returned an indictment against the defendant, Messiah Booker (hereinafter Booker or the defendant), charging him with murder in the second degree and burglary in the first degree. The indictment also charged three codefendants, namely, Booker's brother, sister, and nephew. The criminal charges arose from events that occurred in the early morning hours of January 27, 2013, when, during the course of a home invasion by armed and masked intruders at a home in Flanders, a male occupant of the house was shot and killed (hereinafter the victim). Booker was identified as the intruder who shot the victim. The allegations of the petition emanate from the respondent's conduct in failing to disclose evidence to defense counsel, including that a different individual, John Doe No. 1, was implicated in the crime.
On December 30, 2015, Booker's defense counsel, Brendan M. Ahern, served and filed a Demand to Produce and Request for a Bill of Particulars. This included both general and specific demands under the Constitution of the State of New York and the U.S. Constitution, seeking information indicating Booker's innocence, information tending to impeach the People's witnesses, and all information known to the government which was favorable to the defense, whether or not technically admissible in court, and which was material to the issues of guilt and/or punishment. Defense counsel specifically cited Brady v Maryland (373 US 83 [1963]), and Giglio v United States (405 US 150 [1972]).
On January 29, 2016, the respondent filed a Response to the Demand for Discovery, stating: "It is the People's contention that all discoverable materials . . . in the People's possession have been provided" subject to identified exceptions. The respondent also stated that "[t]he People are cognizant of their duty . . . . [and] are aware of their continuing obligation under Brady to give defendant any exculpatory material in their possession. If and when any such material becomes known to the People, it will be made available to the defendant."
On or about February 10, 2017, defense counsel filed a motion seeking various forms of relief, including a request to compel discovery and the production of Brady/Giglio materials. That motion contained general and specific demands under Brady and Giglio.
On February 24, 2017, the respondent filed his sworn affidavit in opposition asserting, inter alia: "The People have previously submitted discovery on January 29, 2016, as well as turned over additional materials on subsequent dates. The People submit that they have complied with their discovery obligations with the exception of the items noted below." The respondent attached to his affidavit two crime stoppers tips. He did so, not because he believed that he was legally required to do so, but because it was office policy to do so. The caller in the first tip stated, in sum and substance, that Booker was the shooter and that the intended target was a female occupant of the home (hereinafter Jane Doe No. 1) because she was holding on to the proceeds of a burglary that her boyfriend had committed on Doctor's Path, in Riverhead. The caller in the second tip stated, in sum and substance, that another person, John Doe No. 2, fit the description of the person who killed the victim, that an additional person, John Doe No. 3, may have been with him, that John Doe No. 3 may have committed home invasions in the past, and they were part of a gang.
On March 28, 2017, in response to the respondent's application under People Molineux (168 NY 264 [1901] ) and People v Ventimiglia (52 NY2d 350 [1981]), the defense filed another Brady demand seeking disclosure of information derived from a video about a 2012 shooting that was, according to the People's theory of the case, committed with the same gun that was used in the shooting death of the victim.
On March 30, 2017, the respondent responded to the defense's allegations of Brady violations. The respondent argued that the information about the gun was not useful to the defense, was not exculpatory, and even if the court found it to be Brady material, there was no prejudice to the defendant. The respondent supplemented his response by disclosing additional information and documents related to the 2012 shooting carried out with the same gun used to kill the victim.
On April 14, 2017, the respondent submitted Rosario material to the defense (see People v Rosario, 9 NY2d 286 [1961]).
The trial testimony in the Booker case started on April 25, 2017, and continued for seven days through May 3, 2017. The proof against the defendant included the testimony of Jane Doe No. 1, who was in the Flanders home, hiding in a closet, during the murder. She had recognized Booker's voice and immediately identified him to the police. According to Jane Doe No. 1, after hearing a gunshot, she heard Booker say "[John Doe No. 1], that's not part of the plan, what the f-? [*3]Let's go [John Doe No. 1]." Phone records indicated that Booker was present at the time and location of the murder, and that numerous telephone calls were made between telephones belonging to Booker and the codefendants. Two of Booker's accomplices testified against him and identified him as the shooter. Specifically, Booker's former girlfriend testified that she drove Booker to the location and that he admitted to her that he shot the victim. Booker's brother, who was also a codefendant, testified that he was present and an accomplice during the murder and that he witnessed Booker shoot the victim. Both of these witnesses testified that three individuals went inside the Flanders home—Booker, his brother, and his nephew. No forensic evidence connected Booker to the murder.
On the morning of May 3, 2017, the People planned on calling their last witness to the stand, Detective Brendan O'Hara. He was employed by the Suffolk County Police Department, the Homicide Section, and was the lead detective in the Booker case. Just before Detective O'Hara's testimony, defense counsel privately raised with the respondent the subject of Detective O'Hara's "memo book" (or notebook). Defense counsel detected a two-year gap in Detective O'Hara's notebook and inquired whether the detective had conducted any investigation during that period. The respondent informed defense counsel that Detective O'Hara did not cease the investigation during the two-year time frame and "had done other stuff in the meantime" but "it's not Rosario" because the respondent was not going to ask Detective O'Hara about any of the omitted material. At the request of counsel, the trial court convened an off-the-record conference in chambers. The trial court disagreed with the respondent and ordered him to produce the materials. The respondent turned over "the whole book" subject to a protective order. Detective O'Hara had three memo books.
The trial court allowed the respondent to conduct the People's direct examination of Detective O'Hara, and suggested that over the lunch break, defense counsel could carefully review the materials. After the lunch break, defense counsel determined there were more materials he believed should have been turned over including "longform" or "long page" notes attributed to "AR"—Detective Angel Rivera. Defense counsel asserted to the trial court that some of the "most egregious . . . of the materials that were extracted . . . involve[d] the implication of another person admitting to being the shooter." The trial court directed the respondent "to turn them all over." The respondent turned over Detective Rivera's materials to the defense. When reviewing Detective Rivera's materials, the respondent claims to have discovered nine pages of notes from the interview with Jane Doe No. 1, which the respondent said he had never seen before.
On May 4, 2017, the respondent turned over the entire contents of the police investigative file.
On May 9, 2017, the trial court convened a hearing to address defense counsel's allegations of Rosario and Brady violations. Defense counsel started to present a page-by-page analysis of the withheld materials. During the lunch break, the Suffolk DA's office offered a negotiated plea acceptable to the defendant. When court reconvened, the prosecution, now led by the respondent's bureau chief, moved to dismiss the charge of felony murder in the second degree "based upon the events" at the hearing, and stated that the People "will be unable to prove that count beyond a reasonable doubt." Booker pleaded guilty to attempted burglary in the second degree in return for an agreed-upon five-year sentence of incarceration along with five years of postrelease supervision. As a result of the plea, defense counsel did not complete his presentation of the alleged Brady and Rosario violations and the trial court did not make a ruling on these issues.
Based on the foregoing, charge one in the petition alleges that the respondent failed to make timely disclosure to defense counsel in a criminal prosecution—the Booker trial—of the existence of evidence or information known to him, in his capacity as a prosecutor, that tended to negate the guilt of the accused, mitigate the degree of the offense, or reduce the sentence, in violation of rule 3.8(b) of the Rules of Professional Conduct (22 NYCRR 1200.0). Among the factual specifications is that the respondent failed to disclose numerous items of Brady and Rosario material prior to the Booker trial, including the following: that a male (John Doe No. 1) had shot the victim and had admitted to others that he shot the victim; that Jane Doe No. 1—an occupant in the Flanders home who was the only individual who identified Booker—was taking strong medication for depression and ADHD at the time of the Flanders home invasion; that Jane Doe No. 1 kept changing her story; that the Flanders home was targeted because Jane Doe No. 1 had rejected Booker's advances; that the Flanders home was targeted because one of the occupants of the home sold crack and cocaine, and the intruders (one of whom was John Doe No. 1) mistook the victim for that [*4]occupant; that Jane Doe No. 1 told a friend she believed the intruders wanted money she was holding for her boyfriend (a gang member) who had committed an earlier burglary in Riverhead; and that Jane Doe No. 1's boyfriend had targeted her because she had informed the police about the Riverhead burglary.
Charge two alleges that the respondent engaged in conduct that is prejudicial to the administration of justice, in violation of rule 8.4(d) of the Rules of Professional Conduct (22 NYCRR 1200.0), based on the same allegations contained in charge one.
Charge three alleges that the respondent engaged in conduct that adversely reflects on his fitness as a lawyer, in violation of rule 8.4(h) of the Rules of Professional Conduct (22 NYCRR 1200.0), based on the same allegations.
Answer
In his answer, as to charge one, the respondent admitted that he failed to disclose numerous items of Brady and Rosario material prior to the trial. As to the specific items allegedly withheld, he stated that some documents were required to be turned over pursuant to Brady and/or Rosario, while others were not. The better practice, according to respondent, would have been to turn over all of the documents. The respondent denied the truth of the allegations in charges two and three.
Special Referee's Report
In an 88-page written report, the Special Referee sustained the three charges in the petition and found that the petitioner met its burden. In addition to the facts as alleged in the petition, which the Special Referee found were proven by a preponderance of the evidence, the Special Referee made additional factual findings, the most salient of which we now set forth.
The respondent was assigned the Booker case before the indictment, near the end of the investigatory phase. His supervisor assigned him to present the case before the grand jury. The respondent met with the lead detective in the Booker case, Detective O'Hara, to prepare for the grand jury proceeding. About one month before any arrests were made, the respondent and Detective O'Hara "sat down with everything and [Detective O'Hara] took out every folder" in his investigative file. Detective O'Hara described the contents of his folders and the respondent asked for and received certain documents. They "reviewed the case top to bottom." The respondent had Detective O'Hara's entire, unredacted memo book.
Detective O'Hara had a "very brief discussion" with the respondent regarding John Doe No. 1 and Detective O'Hara informed the respondent that John Doe No. 1 "was a witness or suspect early in the case" but that Booker's former girlfriend had said that no individual named John Doe No. 1 had been involved in the crime.
Booker was "immediately" identified as "a suspect." It was "always" the People's contention that Booker was "the shooter." The People's theory of the case was that the home invasion involved five participants, and, specifically, that three of those participants—Booker, his brother, and his nephew—were armed and entered the home. The People alleged that Booker pointed the gun and shot the victim.
When the respondent received defense counsel's December 30, 2015 demand for Brady material, the respondent "didn't do anything specifically in response to that demand" and he "was not aware of any exculpatory material or Brady material." The respondent acknowledged that his written response was "boilerplate." In responding to the demand, the respondent did not make any effort to search the police investigative file for any Brady material.
In preparing his February 24, 2017 response to defense counsel's motion to compel discovery of Brady/Giglio material, the respondent did not review the documents contained in the homicide squad's investigative file. The respondent followed his "ordinary[ ]" practice of relying on the police detectives to alert him to "exculpatory material or something that would be important for [him] to know," including Brady material. The respondent testified that "ordinarily" the detectives would "let [him] know" whether another suspect "is or is not Brady." The respondent did not actively ask to see the homicide squad's investigative folders. The respondent produced the two crime stoppers tips to the defense in response to the motion, but that was done to comply with the Suffolk DA's policy to turn over any crime stoppers tips, not as a deliberate decision to produce the tips as Brady material.
About one month before trial, the respondent scanned Detective O'Hara's file—including Detective O'Hara's "memo books" and other "reports"—into his computer and created a large .pdf file of well over "a thousand pages." The respondent asserted that although he [*5]scanned the file, he "didn't read every page." The respondent testified that during his scanning process, he did not make any effort to discern, discover, or locate whether Brady material existed. He did not ask Detective O'Hara whether there was any exculpatory or Brady-type information in the police investigative file, nor did he ask him to be on the "lookout" for any exculpatory material or anything else as they "were going through literally the entire file."
Detective O'Hara testified at the disciplinary hearing about the respondent's preparation for the Booker trial. At one or more meetings with the respondent, Detective O'Hara brought his complete investigative file folder (with the exception of pictures). Detective O'Hara "brought everything" such as his memo book and copies of the memo books of other detectives, as well as "long page notes" and "all supplementary reports." The respondent scanned "everything" "onto his computer." Detective O'Hara testified that he had only a limited understanding of Brady.
At or about the time of jury selection, the respondent conducted a Rosario review. When reviewing the materials for Rosario purposes, the respondent "flipped through" the materials to ascertain whether statements of the People's testifying witnesses concerning the subject matter of their direct testimony existed. The respondent carefully reviewed each document to redact information, including addresses, telephone numbers, "any witnesses [who] were not involved in the case," and "materials that weren't related to the subject matter of the testimony."
On April 14, 2017, the respondent produced selected, redacted parts of the case file as "Rosario material for trial." The respondent claimed that when he was "going through the materials" for Rosario purposes, he "failed to do a Brady analysis." Selected excerpts of Detective O'Hara's "memo book" had been turned over with heavy redactions.
In responding to the allegations against him, the respondent summarized his view of the defense's theory of the case. The defense strategy included pointing out that two of the witnesses inside the Flanders home during the incident saw only two individuals inside the home. Defense counsel asserted during his opening statement that only two individuals entered the home, specifically, Booker's brother (who was also a codefendant) and another uncharged individual referred to as John Doe No. 1. In this regard, the defense noted that Jane Doe No. 1 claimed that the voice she recognized as Booker's used John Doe No. 1's name during the incident. The defense also claimed that Booker and his brother/co-defendant have similar-sounding voices. The defense theory of the case was consistent with Jane Doe No. 1's statement—which the respondent produced as Rosario material on the eve of trial on April 14, 2017. It was the defense theory that John Doe No. 1 shot the victim and it was the defendant's brother/co-defendant who had said, in essence, John Doe No. 1, why did you do that. According to the defense, Booker had nothing to do with the home invasion.
After defense counsel asserted Brady violations, the respondent's supervisor took over the case on or about May 3, 2017, and Detective O'Hara was asked to produce the entire investigative file. According to the respondent, "it looked like there were materials that should have been turned over that weren't." These undisclosed materials included Detective O'Hara's notes as to the possible involvement of John Doe No. 1 in the crime.
On May 4, 2017, in a letter to defense counsel and the court, the respondent memorialized his document production including Detective O'Hara's and Detective Rivera's unredacted materials. In light of this correspondence, the trial court adjourned the trial, which had been scheduled to resume on May 5, 2017. The trial court's adjournment was designed to provide a partial remedy for defense counsel's complaints, to give him an opportunity to review and formulate a position for the defense.
On Friday, May 5, 2017, the trial court inquired whether the dispute could be resolved or if a hearing should be held. The trial court indicated that if defense counsel were to move for a mistrial, "it will be granted." Defense counsel replied that he did not "want to apply for a mistrial" but instead he was seeking for the case to be "dismissed with prejudice." The court was unwilling to grant that relief at that point. Plea negotiations on May 5, 2017, were unavailing.
Over the weekend, defense counsel reviewed the newly-disclosed materials. The respondent texted him to say "that he had not intentionally deceived" him. Defense counsel had a telephone conversation with the respondent in which he advised the respondent that the Suffolk DA's office "needed to take a low watermark in the [plea] negotiations." The respondent's supervisor called defense counsel to make an offer on the case, but it was not accepted.
On Monday, May 8, 2017, the greater part of the day was consumed with conversations between defense counsel and his client, and between defense counsel and the Suffolk [*6]DA's office. Plea negotiations were unsuccessful.
On Tuesday, May 9, 2017, defense counsel consulted with Booker, and Booker was "steadfast" in his position rejecting the People's offer. At about 11:00 a.m., the trial court convened a hearing on the record pursuant to People v Bottom (76 Misc 2d 525 [Sup Ct, NY County 1974]), with respect to defense counsel's application to dismiss the case with prejudice arising from the People's alleged disclosure violations (see generally People v Andre W, 44 NY2d 179 [1978]). At the outset of the hearing, the trial court summarized the procedural background of the Booker case, and the dispute that led to the need for a Bottom hearing.
The trial court stated on the record that, when the Brady/Rosario dispute arose, the court "inquired of Mr. Kurtzrock as to whether or not he had reviewed said materials, and he told [the court] he had, and assured [the court] that there was no Brady [m]aterial in the material which he felt was not Rosario." At the hearing before the Special Referee, the respondent did not recall making a representation as to Brady material; he recalled only making "a careful search" for, and producing all, Rosario material. According to defense counsel, "an inquiry was made as to whether it contained any Brady material, and the response was no. And there was an expression that it had been carefully reviewed for that purpose, and it removed what they believe not to be Rosario, but there was no Brady materials." Defense counsel argued that the People's representation was incorrect because Detective O'Hara's notes "didn't cover those two years [and] [t]here is a surgical removal of anything favorable to the defense throughout the entirety of the notes." The Special Referee specifically found that the respondent's sworn representation to defense counsel and the trial court—that he had complied with his obligations—was false because the respondent never conducted a Brady review.
At the Bottom hearing, defense counsel argued there had been a "surgical extraction of exculpatory evidence" that "violated [Booker's] Federal and Constitutional right to a fair trial." Defense counsel argued that "both the defense and this Court were deceived" and "[t]he fact that the Brady [material] was surgically removed from the other disclosed material alone warrants a severe response" from the trial court. Defense counsel's application to the trial court generally outlined the alleged Brady violations. Defense counsel stated that there was "[e]vidence that multiple other people have confessed to this murder [which] should have been disclosed at arraignment." He also stated that there was "[e]vidence that unequivocally aligned with the defense theory of the case, both in response to general and specific Brady demands [and] should have been made immediately upon their receipt." Defense counsel thereafter detailed at least some of the alleged Brady/Rosario violations.
After defense counsel completed part of his presentation during the morning of May 9, 2017, the parties took a lunch break, at which time the People and the defendant reached an agreement as to a plea and sentence.
Booker agreed to plead guilty to attempted burglary in the second degree, with a sentence of five years' incarceration and five years of postrelease supervision. The trial court approved Booker's plea and dismissed the felony murder charge in furtherance of justice pursuant to CPL 210.40(1)(a)-(h) and (j). The trial court agreed with the People's assessment on the basis of defense counsel's presentation concerning the nondisclosures, and the court stated: "this afternoon's record from the Bottom [h]earing which the Court ordered pursuant to [defense counsel's] application, and the likely resulting sanctions from that hearing, would appear to dictate that the probability of a conviction on the top count in the indictment has been severely diminished." The court stated that CPL 210.40(e) "speaks to serious misconduct in the prosecution of the defendant. I think the record speaks for itself in that regard." In light of the plea agreement, the Bottom hearing was discontinued without a formal decision by the court on defense counsel's application.
Later that day, the respondent tendered his letter of resignation as a prosecutor with the Suffolk DA's office.
The Special Referee's Findings as to Charge One
Rule 3.8(b) of the Rules of Professional Conduct (22 NYCRR 1200.0) provides:
"A prosecutor or other government lawyer in criminal litigation shall make timely disclosure to counsel for the defendant or to a defendant who has no counsel of the existence of evidence or information known to the prosecutor or other government lawyer that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the sentence, except when relieved of this responsibility by a [*7]protective order of a tribunal."
A conflict in authority exists concerning the scope of rule 3.8(b). Some authorities contend that rule 3.8(b), or their local analog,—defining a prosecutor's duty to disclose to the defense evidence or information that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the sentence—is coextensive with Brady, or stated somewhat differently, a codification of Brady (see e.g. In re Attorney C, 47 P3d 1167, 1171 [Colo 2002]; In re Ronald Seastrunk, 236 So3d 509, 510 [La 2017]; Disciplinary Counsel v Kellogg-Martin, 124 Ohio St 3d 415, 419, 923 NE2d 125, 130 [Ohio 2010]; State ex rel. Oklahoma Bar Assn v Ward, 353 P3d 509, 521 [Okla 2015]; In re Petition to Stay the Effectiveness of Formal Ethics Opinion 2017-F-163, 582 SW3d 200 [Tenn 2019]; In re Riek, 350 Wis2d 684, 695-697, 834 NW2d 384, 390 [Wis 2013]). Other authorities hold that rule 3.8(b) imposes distinct ethical obligations upon prosecutors that are independent of Brady (see People v Waters, 35 Misc 3d 855, 859-860 [Sup Ct, Bronx County 2012]; People v Robinson, 34 Misc 3d 1217[A], 2011 NY Slip Op 52485[U], *2-3 [Crim Ct, Queens County 2011]; accord In re Kline, 113 A3d 202 [DC 2015]; Matter of Larsen, 379 P3d 1209, 1216 [Utah 2016]; In re Disciplinary Action Against Feland, 820 NW2d 672 [ND 2012]; see also Joel Cohen, Disclosure of Information: Is Complying With 'Brady' Enough?, Ethics and Criminal Practice, NYLJ, June 9, 2015 at 3, col 1; NY City Bar Assn Comm on Prof Ethics Formal Op 2016-3 at 2 [2016] ["there is no evidence to support" the view that "Rule 3.8 is simply an ethical codification of Brady"]; NY City Bar Assn Comm on Prof Ethics Formal Op 2016-3 at 4 ["Rule 3.8(b) is not a codification of disclosure obligations established by law"]; NY City Bar Assn Comm on Prof Ethics Formal Op 2016-3 at 4 ["(t)he history and comments to Rule 3.8(b) confirm that it is not meant to codify legal disclosure obligations" (alterations omitted)]; ABA Comm on Ethics and Prof Responsibility Formal Op 09-454 [2009]["[t]he drafters of Rule 3.8(d)"—the ABA Model Rule upon which New York's Rule 3.8(b) is patterned—"made no attempt to codify the evolving constitutional case law"]). The United States Supreme Court has observed in obiter dictum that ethical rules requiring prosecutorial disclosure may impose obligations broader than those imposed under Brady (see Cone v Bell, 556 US 449, 470 n 15 [2009] ["Although the Due Process Clause of the Fourteenth Amendment, as interpreted by Brady, only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations"]; Kyles v Whitley, 514 US 419, 437 [1995] [Brady "requires less of the prosecution than" ethical standards]).
The Special Referee found that the respondent's conduct violated both Brady and rule 3.8(b). The respondent does not contest these findings.
The Respondent's Admissions
The respondent has admitted violating his prosecutorial obligations under both Brady and Rosario. Further, according to the unchallenged findings of the Special Referee, the petitioner adduced substantial evidence that the respondent failed to disclose 48 items that should have been disclosed under Brady—including materials implicating an alternative suspect, John Doe No. 1, as the shooter and murderer of the victim, as well as information that undermined the credibility of the People's main trial witnesses—from Booker's former girlfriend and Jane Doe No. 1. We need not discuss all 48 items; it is sufficient to discuss items that the respondent admits are violations.
1. Another Suspect: The John Doe No. 1 Items
The respondent admitted that the John Doe No. 1 items should have been turned over to the defense under Brady. The petitioner demonstrated that the homicide squad received leads from various sources and individuals who stated that John Doe No. 1 was involved in the home invasion or was the shooter. This information was extensively documented in Detective O'Hara's and Detective Rivera's memo book entries, written reports, and interview notes. This information—that there was another suspect in the crime — undermined the People's theory of the case and bolstered the defense's theory of the case.
The respondent knew from Jane Doe No. 1 that John Doe No. 1 was a possible suspect. Her written statement, inter alia, signed in the presence of Detective O'Hara, was that after she heard a gun shot, she heard a male voice say "[John Doe No. 1] that's not part of the plan, what the fk? Let's go [John Doe No. 1]." The respondent turned over her statements to the defense on or about April 14, 2017.
Detective O'Hara testified that he had informed the respondent that John Doe No. 1 "was a witness or suspect early in the case." The respondent knew about this Brady material and [*8]evidence related to John Doe No. 1. The respondent testified:
"Everything corroborated what [Booker's former girlfriend] had said. At that point—and she had specifically said, I don't know who [John Doe No. 1] is. There is no [John Doe No. 1] involved in this . . . as I'm going through the materials I ask [Detective O'Hara] about this no pick. Who is this. Is this one of the defendants. We need to advise him of this. It's Brady material. He said, no, no. It was an early suspect in the case. He's been excluded. Okay. And that was it. That was why we had credited what [Booker's former girlfriend] had said."
It should be noted that the respondent provided a no-pick photo array to the defense. The respondent testified that he asked Detective O'Hara, "what's this [John Doe No. 1]. . . . do [Booker's brother or nephew] have a nickname [John Doe No. 1], what's the deal. This is something which, obviously, the defense is going to latch onto. And [Detective O'Hara] said, we looked into a possible [John Doe No. 1] early on and nothing came of it."
2. Information Undermining Jane Doe No. 1's Credibility
Jane Doe No. 1 was a main witness for the prosecution because her testimony placed Booker in the Flanders home at the time of the murder. When intruders entered the home, she hid in a closet. None of the victims of the home intrusion, other than Jane Doe No. 1, identified any individual as the perpetrator. She testified that she recognized Booker's voice.
The petitioner demonstrated that evidence existed—which was withheld from the defense—that directly undermined Jane Doe No. 1's truthfulness. For instance, there was a note by one of the investigating detectives who interviewed a person who had spoken to Jane Doe No. 1 after the incident. This person informed the detective that "[Jane Doe No. 1] keeps changing her story." The respondent admitted that this line should have been turned over under Brady.
The petitioner also demonstrated that the respondent did not disclose nine pages of handwritten notes from Detective Rivera taken during a Sunday, January 27, 2013 interview with Jane Doe No. 1. Those notes documented that she was taking strong, prescription medication that could have impaired her powers to perceive, retain, and communicate information at the time of the crime: "Usually I would be crying, but the pills ain't letting me. I suffer from depression/ADHD so I take 'Strattera.' Last took on Friday a.m. [before] school. They're strong." At the time of the home invasion, Jane Doe No. 1 was 16 years old. The respondent admitted that he did not disclose these notes. The respondent conceded that these documents should have been disclosed as both Brady and Rosario material.
3. Information Undermining the Credibility of the Cooperating Accomplice—Booker's Former Girlfriend
A cooperating accomplice, Booker's former girlfriend, testified for the People in the Booker trial. At the disciplinary hearing, the petitioner demonstrated that the respondent did not disclose documents of out-of-state police investigative activity relating to Booker's former girlfriend. This included notes in which she told a detective the following: "I was driving the [getaway] car, but I had no idea what was going on." This information was in the respondent's custody and control. This information was favorable to the defense. At trial, Booker's former girlfriend testified that she and others went to the Flanders home to commit a robbery—to get drugs or money. The respondent admitted that her statement should have been disclosed under Brady.
The Special Referee Sustained All Charges
Based upon his findings, and the respondent's admissions, the Special Referee sustained all three charges.
The petitioner moves to confirm the Special Referee's report and for the imposition of such discipline as the Court deems just and proper. In response, the respondent concedes that he failed to disclose numerous items of Brady or Rosario material, asserts that some unidentified materials cited by the petitioner were neither Brady nor Rosario material, and urges that, in view of substantial mitigation presented, the discipline to be imposed should be no greater than a public censure.
The Special Referee's Report Should Be Confirmed
Prosecutors have been the subject of disciplinary proceedings in New York courts for at least one century (see e.g. Matter of Rodeman, 65 AD3d 350, 353 [4th Dept 2009] [finding that respondent "violated the duty owed by every lawyer to the court to be candid and honest and has [*9]engaged in conduct that is inconsistent with his obligations as a public prosecutor"]; Matter of Stuart, 22 AD3d 131, 132 [2d Dept 2005] [sustaining charge that prosecutor gave false information to the court during a homicide trial]; Matter of Robinson, 70 AD2d 209 [4th Dept 1979] [disbarring federal prosecutor for providing confidential information on pending cases to alleged members of organized crime]; Matter of Dreiband, 273 App Div 413, 414 [1st Dept 1948] [censuring prosecutor for using false testimony in summation]; Matter of Markewich, 192 App Div 243, 248 [1st Dept 1920] [censuring prosecutor for speech accusing judge of dishonesty]). It cannot be doubted that "[prosecutorial] infractions may lead to disciplinary action" (People v Roopchand, 107 AD2d 35, 37 [2d Dept 1985], affirmed for the reasons stated in the Per Curiam opinion at the Appellate Division, 65 NY2d 837, 838 [1985]). Discipline has not been restricted to appointed assistants; elected District Attorneys have been subject to discipline for professional misconduct (see Matter of Holtzman, 78 NY2d 184, 191 [1991] [sanctioning District Attorney of Kings County for conduct reflecting adversely on her fitness to practice law]; Matter of Rain, 162 AD3d 1458, 1460-1461 [3d Dept 2018] [suspending District Attorney of St. Lawrence County for two years on the basis of, inter alia, violating rule 3.8(b) and Brady for failing to take any action with respect to disclosing exculpatory material]; Matter of Soares, 97 AD3d 242, 244-245 [4th Dept 2012] [finding that District Attorney of Albany County engaged in conduct prejudicial to the administration of justice through his office's misleading press release]; Matter of D'Arcy, 49 AD2d 197, 198 [4th Dept 1975] [disbarring District Attorney of Allegany County for official misconduct]).
1. Charge One—Brady Violations
A prosecutor's disclosure obligations under Brady are well established. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution" (Brady v Maryland, 373 US at 87; see also People v Rong He, 34 NY3d 956, 958 [2019] [witnesses' statements "directly contradicted the People's theory of the case" and should have been disclosed under Brady]). "Impeachment evidence falls within the ambit of a prosecutor's Brady obligation" (People v Fuentes, 12 NY3d 259, 263 [2009]). Prosecutors have been disciplined for Brady violations (see Matter of Rain, 162 AD3d at 1460 [confirming findings of prosecutorial misconduct, including nondisclosure of exculpatory evidence]; Matter of Brophy, 83 AD2d 975 [3d Dept 1981] [censuring respondent for Brady violation]; see also Matter of Weissman, 176 AD3d 77 [2d Dept 2019]).
The evidence adduced by the petitioner fully satisfies the tripartite test for a Brady violation. A Brady violation is established when it is shown that "(1) the evidence is favorable to the defendant because it is either exculpatory or impeaching in nature; (2) the evidence was suppressed by the prosecution; and (3) prejudice arose because the suppressed evidence was material" (People v Fuentes, 12 NY3d at 263, citing Strickler v Greene, 527 US 263, 281-282 [1999]). Evidence that another suspect was involved in the shooting (John Doe No. 1) and evidence that undermined the credibility of key witnesses (Jane Doe No. 1 and Booker's former girlfriend) was favorable to the defendant. The respondent suppressed this favorable evidence: the respondent suppressed the materials by his admitted failure to conduct any Brady review or analysis of the materials in his possession and to which he had access. The suppressed evidence was material: The respondent's nondisclosures interrupted the trial, foreclosed a full trial record, prevented the defense's cross-examination of Detective O'Hara, and precluded a jury verdict. The felony murder trial collapsed mid-trial as a direct result of the respondent's nondisclosures, and this establishes the materiality of those nondisclosures.
The Special Referee found that the respondent's claims, raised at the disciplinary hearing—that some of the items were immaterial, that defense counsel should have known about the John Doe No. 1 items, that the nondisclosures should be ignored because the documents contained inadmissible hearsay and both exculpatory and inculpatory evidence—were baseless. The respondent barely alludes to these assertions in his response to the petitioner's motion. We find these contentions to be without merit.
2. Charge One — Rule 3.8(b) Violations
The respondent's conduct violated rule 3.8(b) in that (1) the respondent was a prosecutor in criminal litigation; (2) he failed to make a "timely disclosure" to the accused; (3) the respondent admitted the existence of favorable evidence or information; (4) the favorable evidence was known to the respondent; and (5) the respondent did not seek a protective order excusing his nondisclosures.
With respect to the fourth prong, the Special Referee found that the respondent had actual knowledge of the existence of undisclosed Brady-type material. The respondent was aware of and put on notice of his Brady obligations. His handling of the undisclosed documents put him on direct notice of the existence of evidence or information favorable to the defendant.
In addition, the Special Referee found that the respondent engaged in a deliberate pattern of avoidance, or willful blindness, in his handling of the documents in the police file. The respondent understood that there was a high probability of the existence of Brady-type materials and he took deliberate, volitional, and extraordinary actions to attempt to avoid learning of the existence of Brady-type materials in the Booker case. He blinded himself to the Brady material by not conducting a Brady review or analysis. He consciously delegated his duties under Brady to Detective O'Hara, whom he expected to alert him to exculpatory information. But he never asked Detective O'Hara whether there was any exculpatory or Brady-type information in the police file, and Detective O'Hara disavowed any meaningful insight into Brady.
The findings of the Special Referee are supported by the evidence.
3. Charge One Should Be Sustained
The prosecutor's role as a "public officer[ ]" is well recognized (People v Colon, 13 NY3d 343, 349 [2009]; Matter of Curry v Hosley, 86 NY2d 470, 473 [1995] ["[T]he District Attorney's client is the people of the State of New York"]). A prosecutor is an officer of the court and a representative of the People of the State (see Matter of Stuart, 22 AD3d at 133; People v Dennis, 62 AD2d 1022, 1022 [2d Dept 1978] ["The duty of the district attorney, therefore, is not merely to obtain convictions, but to see that justice is done"]; Matter of Sedore v Epstein, 56 AD3d 60 [2d Dept 2008]; see also People v Thompson, 22 NY3d 687, 697 [2014] ["due process imposes upon the prosecutor a 'duty of fair dealing to the accused and candor to the courts,' thus requiring the prosecutor 'not only to seek convictions but also to see that justice is done'"] [citations omitted]; People v Santorelli, 95 NY2d 412, 420-421[2000] ["Prosecutors . . . are charged not simply with seeking convictions but also with ensuring that justice is done"]; People v Steadman, 82 NY2d 1, 7 [1993] ["Prosecutors . . . are charged with the duty . . . to see that justice is done"]; People v Fielding, 158 NY 542, 547 [1899] ["public prosecutor . . .is . . . presumed to act impartially in the interest only of justice"]; see generally Bruce A. Green, Why Should Prosecutors "Seek Justice"?, 26 Fordham UrbLJ 607, 612-618 [1999] [explaining historical overview of the duty to "seek justice" or "do justice"]). "The District Attorney is an advocate, but, at the same time, he [or she] is a quasi-judicial official and his [or her] primary duty is to see that justice is done and the rights of all — defendants included — are safeguarded" (People v Adams, 21 NY2d 397, 402 [1968] [internal quotation marks omitted]).
A prosecutor's duty as a public officer is fulfilled by disclosing exculpatory and impeaching evidence as contemplated by applicable laws and rules. "In their role as public officers, prosecutors 'must deal fairly with the accused and be candid with the courts' . . . [and] disclose exculpatory or impeaching evidence" (People v Colon, 13 NY3d at 349 [citation omitted]; see also People v Waters, 35 Misc 3d at 858 [noting that Brady violations are "antithetical to the unique role of a prosecutor in our criminal justice system"]; People v Gonzalez, 74 AD2d 763, 765 [1st Dept 1980] ["Our concern here is to emphasize once again the importance we attach to the duty of Assistant District Attorneys scrupulously to discharge their obligations to make available to defense counsel material required to be disclosed under . . . Brady"]; Daniel J. Capra, Access to Exculpatory Evidence: Avoiding the Agurs Problems of Prosecutorial Discretion and Retrospective Review, 53
Fordham L Rev 391, 394 [1984] ["the prosecutor [has] a duty to see justice done—from which a duty to turn over exculpatory evidence would seem a natural outgrowth" (footnote omitted)]). And this duty may require the prosecutor to act decisively to ensure cooperation of investigating agencies in the discharge of obligations under Brady (see Daniel Richman, Prosecutors and Their Agents, Agents and Their Prosecutors, 103 Colum L Rev 749, 818 n 310 [2003]).
The prosecutor's role as an "advocate" is also well recognized (People v Adams, 21 NY2d at 402; see Imbler v Pachtman, 424 US 409, 423 [1976] ["'The office of public prosecutor is one which must be administered with courage and independence'"] [citation omitted]; People v Steadman, 82 NY2d at 7). Several commentators, speaking with the benefit of practical prosecutorial experience, have aptly described the prosecutor's advocacy role (see e.g. H. Richard Uviller, Ethics in Criminal Advocacy, Symposium, The Neutral Prosecutor: The Obligation of Dispassion in a Passionate Pursuit, 68 Fordham L Rev 1695, 1718 [2000] ["Investigation and adjudication call for [prosecutorial] neutrality, while the trial mode of the advocate demands full [*10]partisan commitment"]; Whitney North Seymour, Jr., Why Prosecutors Act Like Prosecutors, 11 Rec of Assn of Bar of City of NY 302, 313 [1956] [once the prosecutor is "satisfied [ ] of the defendant's actual guilt"—which decision is "fortified by the Grand Jury's decision that [defendant] be held for trial"—the prosecutor "must act with candor and fairness, but [the prosecutor] must also fight for his [or her] cause"]).
The prosecutor's dual roles as advocate and public officer are entirely compatible and mutually reinforcing. As Justice Sutherland observed:
"[A prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, [the prosecutor] is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. [A prosecutor] may prosecute with earnestness and vigor-indeed, . . . should do so. But, while [the prosecutor] may strike hard blows, he [or she] is not at liberty to strike foul ones. It is as much [a] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one"
(Berger v United States, 295 US 78, 88 [1935]; accord People v Zimmer, 51 NY2d 390, 393 [1980] [following Berger]; Matter of Sedore v Epstein, 56 AD3d at 66-67 [same]).
The observation made in Berger—that a prosecutor must abstain from acting with impropriety to bring about a wrongful conviction—is trenchant in our time and most pertinent in the context of Brady. The failure of a prosecutor to produce favorable information to the defense as required by Brady may contribute to a wrongful conviction (see Final Report of the New York State Bar Association's Task Force on Wrongful Convictions 19, 24-26, https://www.nysba.org/WorkArea/DownloadAsset.aspx?id=26663 [Apr. 4, 2009]). A prosecutor's zeal to obtain a conviction must be tempered by the obligation to act with responsibility, including the responsibility not to obtain a conviction of the wrong person. A conviction that is wrongful both punishes the wrong person and allows the truly responsible party to evade justice.
"[T]he prosecutor who deals forthrightly and flexibly with witnesses, defendants, and defense counsel serves both systemic values and his goals as an advocate . . . and . . . compliance with constitutional, statutory and ethical standards is not enough—the prosecutor must act within their full spirit, as well, and by doing so detracts not at all from the quality of his advocacy, but enhances it."
(Benjamin Civiletti, The Prosecutor As Advocate, 25 NYL Sch L Rev 1, 20 [1979]; see also Robert H. Jackson, The Federal Prosecutor, 31 J Crim L & Criminology, 3, 4 [Summer 1940] [exhorting prosecutors that "while you are being diligent, strict, and vigorous in law enforcement, you can also afford to be just" because "[a]lthough the government technically loses its case, it has really won if justice has been done"]).
A prosecutor's failure to disclose exculpatory information has been determined to constitute conduct that is prejudicial to the administration of justice in violation of rule 8.4(d) (see Matter of Rain, 162 AD3d at 1460-1461). Brady vindicates "our system of the administration of justice" (Brady v Maryland, 373 US at 87). Rosario is likewise animated by "notions of fundamental fairness or . . . 'a right sense of justice'" (People v Banch, 80 NY2d 610, 615 [1992] [Kaye, J.], quoting People v Rosario, 9 NY2d at 289). The respondent's conduct was seriously inconsistent with his responsibility as an officer of the court.
The respondent's acts and omissions demonstrate that, as the Special Referee found, he abdicated his duty as a public officer to ensure that justice shall be done and allowed his advocacy role to eclipse and supplant his role as a public officer. We condemn as well the respondent's actions in purporting to delegate his own ethical obligations to a police detective.
4. Charge Two Should Be Sustained
Charge two is predicated upon the same conduct as set forth in charge one. The respondent's acts and omissions seriously interfered with the administration of justice, in violation of rule 8.4(d). The defendant was deprived of a fair trial and the victim's family was deprived of a full measure of justice. Public trust and confidence in the criminal justice system was also [*11]undermined. The respondent's acts and omissions contributed to a juridical vacuum in which no member of the prosecution team was focused on the due process rights of the accused under Brady, and this is manifestly prejudicial to the administration of justice. Thus, the criminal justice system was prejudiced by the respondent's acts and omissions.
5. Charge Three Should Be Sustained
Charge three is also predicated on the same allegations as in charge one. The Special Referee found that the respondent violated rule 8.4(h) by engaging in conduct that adversely reflects on his fitness as a lawyer. Violating rule 8.4(d) is illustrative of conduct that reflects adversely on one's fitness to practice law under rule 8.4(h) (see rule 8.4 Comment [2] Rules of Professional Conduct [22 NYCRR 1200.0] [reprinted in Roy D. Simon Jr., Simon's New York Rules of Professional Conduct Annotated Rule 8.4 (Dec. 2020 Update)]). The respondent's acts and omissions were fundamentally incompatible with his role and duties as a prosecutor: he abdicated his duty as a public officer to ensure that justice shall be done and allowed his advocacy role to eclipse and supplant his role as a public officer. The respondent's admitted neglect of his disclosure obligations reflects adversely on his fitness as a lawyer.
Conclusions
For these reasons, the petitioner's motion to confirm the report of the Special Referee should be granted and all charges should be sustained.
In considering the appropriate discipline to impose, we find that a substantial factor in aggravation is that the respondent's misconduct occurred in his capacity as a prosecutor, a public officer. Prosecutors, in their role as advocates and public officers, are charged with seeing that justice is done—to act impartially, to have fair dealing with the accused, to be candid with the courts, and to safeguard the rights of all (see People v Thompson, 22 NY3d at 697; People v Santorelli, 95 NY2d at 420-421; People v Adams, 21 NY2d at 402; People v Fielding, 158 NY at 547; Matter of Sedore v Epstein, 56 AD3d at 66). A prosecutor is in a "peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer" (Berger v US, 295 US at 88). Inherent in the duty as a prosecutor is the duty to turn over exculpatory and impeaching material to defense counsel (see People v Colon, 13 NY3d at 349). Brady violations are "antithetical to the unique role of a prosecutor in our criminal justice system" (People v Waters, 35 Misc 3d at 858). The respondent was a seasoned prosecutor with extensive experience. His conduct in relation to the Booker case merits the strongest possible condemnation because his actions deprived the defendant of a fair trial and also deprived the victim's family of a determination as to whether the defendant was responsible for the homicide and, if so, the imposition of a just sentence.
Against the grave violations of professional standards committed by the respondent, we give weight to the extensive evidence in mitigation, credited by the Special Referee. There was no showing of intentionally malicious or venal conduct. While the respondent committed extensive misconduct in one case, there was no showing that he engaged in any similar conduct in any other cases notwithstanding the respondent's assertion to the effect that he customarily delegated responsibility for compliance with Brady to the police. The respondent accepted responsibility and demonstrated remorse. He cooperated with the petitioner in this proceeding to the extent that he admitted his misconduct, though he did backtrack somewhat during the hearing conducted by the Special Referee. The respondent has no prior disciplinary record. The Special Referee found that the respondent presented substantial, credible evidence of his reputation and good character. It is unlikely that the respondent will engage in similar misconduct in the future given his resignation from the Suffolk DA's office. He has engaged in community service outside of his prosecutorial duties. We consider as well the Special Referee's finding that a member of the respondent's family had a medical issue which created a burden upon the respondent and this should be considered in mitigation.
We find that the respondent's conduct warrants his suspension from the practice of law. He committed serious misconduct that undermines the public's trust in the justice system (Matter of Weissmann, 176 AD3d at 77; Matter of Stuart, 22 AD3d at 131; Matter of Rain, 162 AD3d at 1462). Under the totality of the circumstances, the respondent is suspended from the practice of law for a period of two years.
SCHEINKMAN, P.J., MASTRO, RIVERA, DILLON and BALKIN, JJ., concur.
ORDERED that the petitioner's motion to confirm the Special Referee's report is [*12]granted; and it is further,
ORDERED that the respondent, Glenn Kurtzrock, admitted as Glenn Ross Kurtzrock, is suspended from the practice of law for a period of two years, commencing February 1, 2021, and continuing until further order of this Court. The respondent shall not apply for reinstatement earlier than August 1, 2022. In such application (see 22 NYCRR 691.11, 1240.16), the respondent shall furnish satisfactory proof that during the period of suspension he (1) refrained from practicing or attempting to practice law, (2) fully complied with this opinion and order and with the terms and provisions of the written rules governing the conduct of disbarred or suspended attorneys (see 22 NYCRR 1240.15), (3) complied with the applicable continuing legal education requirements of 22 NYCRR 691.11(a), and (4) otherwise properly conducted himself; and it is further,
ORDERED that during the period of suspension and until further order of the Court, the respondent, Glenn Kurtzrock, admitted as Glenn Ross Kurtzrock, shall comply with the rules governing the conduct of disbarred or suspended attorneys (see 22 NYCRR 1240.15); and it is further,
ORDERED that pursuant to Judiciary Law § 90, during the period of suspension and until such further order of this Court, the respondent, Glenn Kurtzrock, admitted as Glenn Ross Kurtzrock, shall desist and refrain from (1) practicing law in any form, either as principal or agent, clerk, or employee of another, (2) appearing as an attorney or counselor-at-law before any court, Judge, Justice, board, commission, or other public authority, (3) giving to another an opinion as to the law or its application or any advice in relation thereto, and (4) holding himself out in any way as an attorney and counselor-at-law; and it is further,
ORDERED that if the respondent, Glenn Kurtzrock, admitted as Glenn Ross Kurtzrock, has been issued a secure pass by the Office of Court Administration, it shall be returned forthwith to the issuing agency and the respondent shall certify to the same in his affidavit of compliance pursuant to 22 NYCRR 1240.15(f).
ENTER:
Aprilanne Agostino
Clerk of the Court